U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed September 26, 2007      United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| THE BOMBAY COMPANY, INC., | § | CASE NO. 07-44084-rfn-11 |
| THE BOMBAY FURNITURE | § | CASE NO. 07-44085-rfn-11 |
| COMPANY, INC., BBA HOLDINGS, | § | CASE NO. 07-44086-dml-11 |
| LLC, BOMBAY INTERNATIONAL, | § | CASE NO. 07-44087-rfn-11 |
| INC., BAILEY STREET TRADING | § | CASE NO. 07-44088-dml-11 |
| COMPANY, AND BMAJ, INC. | § | CASE NO. 07-44061-dml-11 |
| | § | |
| | § | Jointly Administered Under |
| DEBTORS. | § | Case No. 07-44084-dml-11 |

MEMORANDUM OPINION

Before the court is Debtors' Motion to Approve Comprehensive Sale Process Including Sale to the Highest Bidders and to: (A) Approve Bid Procedures and Protections; (B) Schedule a Sale Hearing; (C) Approve the Form and Manner of Notice Related Thereto; (D) Authorize Sale Free and Clear of All Liens, Claims, Encumbrances and Interests; and (E) Grant Related Relief (the "Motion"). Debtors initially requested a hearing on the Motion on September 20, 2007,[1] but the court declined to consider the Motion until September 25, 2007. On that and the following day, the court heard

---

[1] Debtor BMAJ, Inc., filed its chapter 11 petition on September 19, 2007. The remaining Debtors commenced their cases shortly after 12:01 a.m. on September 20. The court convened on Debtors' first day motions, including the Motion, at 8:30 a.m. on September 20.

Memorandum Opinion – Page 1

testimony respecting the Motion from Robert Duffy ("Duffy"), a managing director of FTI Consulting, Inc. ("FTI"), Paul Traub ("Traub") a principal of Asset Disposition Advisors, LLC ("ADA"), a liquidation specialty firm, and Elaine Crowley ("Crowley"), Debtors' Chief Financial Officer. The Motion was opposed by certain of Debtors' landlords.

The Motion is subject to the court's core jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A) and (M). This memorandum opinion embodies the court's findings of fact and conclusions of law. Fed. R. Bankr. P. 7052 and 9014.

## I. Background

Debtors are retailers operating approximately 388 retail stores in the United States and Canada. Debtors sell various home décor products at these outlets. Beginning more than a year ago, Debtors encountered difficulties that led to cost-cutting efforts and the retention of an investment banker to find a financial partner or acquirer that would enable Debtors to continue in business.

Following more than six months of searching, it became apparent in the summer of 2007 that Debtors would be unable to find an investor or purchaser interested in Debtors as then configured. In July of 2007, therefore, Debtors retained FTI to prepare an analysis of how Debtors might be down-sized through store closings such that they might continue as a smaller entity. FTI determined approximately 160 stores were sufficiently unprofitable as to warrant closing; however, even on such a reduced basis, Debtors' operations did not attract a buyer or investor in the next two months.

Consequently, in early September 2007**,** Debtors engaged ADA to find an agent that would enter into an agreement to pay a price for and liquidate Debtors' inventory. ADA

was successful in obtaining bids from two liquidation joint ventures, the better of which was by Tiger Capital Group, LLC, Crystal Capital, LP, and SB Capital, LLC (the "Tiger JV"). The bid by the Tiger JV was obtained by Debtors to serve as a stalking-horse bid to be used in an auction process by which Debtors would offer their operations for sale.

Debtors funded their operations through two principal credit lines. First, Debtors were parties to a revolving line of credit of up to $125 million advanced by a group of lenders led by General Electric Credit Corp. (the "GECC Line" and "GECC").[2] At the time of commencement of their cases, Debtors owed approximately $80 million (including outstanding letters of credit) on the GECC Line. Second, Debtors were parties to a $10 million term loan advanced by a group led by GB Merchant Partners, LLC (the "GB Loan" and "GB"). At commencement of their cases, Debtors owed $10 million on the GB Loan. Essentially all of Debtors' assets were pledged to secure the GECC Line and the GB Loan. In addition to the Motion, included in Debtors' first-day pleadings was a motion seeking authority under sections 363 and 364 of the Bankruptcy Code (Title 11 of the United States Code; hereafter the Bankruptcy Code will be referred to as the "Code") to use the cash collateral of GECC and GB and to borrow further funds to facilitate purchases of inventory[3] and maintain Debtors' operations.

Under the agreement with the Tiger JV, the joint venture was provided a break-up fee of $1,080,000[4] to be paid if it was not ultimately the successful bidder at the eventual auction. The significance of the agreement with the Tiger JV (and, hence, the break-up

---

[2] The GECC Line included a sub-limit for letters of credit.

[3] Debtors primary inventory sources are in Asia, and a substantial lead time in ordering inventory is necessary.

[4] During the hearing on September 26, Debtors advised the court that the break-up fee would be subject to proration under certain circumstances.

fee) is enhanced by GECC's and GB's conditioning of their agreement to Debtors' chapter 11 financing on the subsistence of the agreement with the Tiger JV.[5]

By the Motion, Debtors ask approval of (1) the agreement with the Tiger JV, including the break-up fee; and (2) sale procedures. The latter would require bids by parties wishing to serve as an additional, going concern, stalking-horse bidder (as opposed to a liquidation bidder) by September 28, 2007. Debtors would then undertake to choose and document a going concern, stalking horse bid (if any satisfactory bid were received) by October 5, 2007. Debtors would then hold an auction on October 10 (and possibly October 11) and submit a sale (or sales) for court approval at a hearing on October 12, 2007 (or, under certain circumstances, October 15). Debtors propose to consider bids for acquiring all of their stores on a going concern basis; some of their stores on a going concern basis, perhaps in conjunction with a liquidation of remaining stores; or all inventory on a liquidation basis.[6] All of this, Debtors insist, must be approved in advance, at this time, because the availability of funding from GECC and GB will run out in mid-October and, besides, any bidder will want the advantage of holiday season operations.[7]

## II. Discussion

Pursuant to Code § 363(b)(1), a chapter 11 debtor-in-possession "after notice and a hearing may use, sell, or lease, other than in the ordinary course of business, property of

---

[5] If the bid of the Tiger JV is successful, the debt under the GECC Line and the GB Loan will be paid in full. Thus the bid of the Tiger JV effectively serves as a financial accommodation for the benefit of GECC and GB.

[6] Debtors also propose to auction lease designation rights.

[7] Testimony given by Duffy and Traub at the hearing was unclear as to whether this means a buyer must take over by October 15, October 18 or November 1.

the estate." Although there is case law that suggests that disposition of estate property in a fashion dispositive of the results of a debtor's reorganization is inappropriate other than through a plan of reorganization,[8] there is also ample authority that section 363(b)(1) may be used to dispose of all or most of a chapter 11 debtor's assets through the sale in a going concern configuration or by liquidation. *See, e.g.*, *In re Lionel Corp.,* 722 F.2d 1063 (2d Cir. 1983); *In re Ames Dept. Stores, Inc.,* 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992); 3 COLLIER ON BANKRUPTCY ¶ 363.02[3] (15th ed. rev. 2005). Indeed, General Order 2006-02 of this court, establishing procedures for complex chapter 11 cases, contemplates such transactions even in the early days of a chapter 11 case.

The sort of "notice and hearing" that is a prerequisite to approval of a sale, such as is contemplated by the Motion, is not fixed by law. Code § 102(1) states that the phrase means "such notice as is appropriate in the particular circumstances, and such opportunity for hearing as is appropriate in the particular circumstances." A leading commentator, however, notes that "a party in interest . . . is entitled to notice and an opportunity to be heard before its rights are affected." 2 COLLIER ON BANKRUPTCY ¶ 102.02 (15th ed. rev. 2007) (citing *Western Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indus.)*, 43 F.3d 714, 720 (1st Cir. 1994)).

The court may safely presume notice to be satisfactory if it complies with the Federal Rules of Bankruptcy Procedure. Fed. R. Bankr. P. 2002(a)(2) provides for 20 days notice of "a proposed use, sale, or lease of property of the estate other than in the ordinary course of business." The rule goes on to state, however, that the court, for cause shown, may shorten the notice period. It would seem, then, that the 20 day notice period

---

[8] *See Pension Benefit Guaranty Corp. v. Braniff Airways, Inc., (In re Braniff Airways, Inc.)*, 700 F.2d 935 (5th Cir. 1983). *Braniff* continues to have vitality. *See In re First South Sav. Ass'n*, 820 F.2d 700, 714 (5th Cir. 1987).

Memorandum Opinion – Page 5

may be shortened so long as sufficient notice is given to allow parties in interest whose rights are to be affected to contest a proposed use, sale or lease of estate property.

In the case at bar, although actual sale of most of Debtors' assets is to be deferred to a hearing on October 12, 2007, the procedures called for by the Motion, once adopted by the court, will set in motion an inexorable process that must, inevitably, lead to a sale or sales that effect the consummation of Debtors' "reorganization." Should the Motion be granted, the parties will have no choice but to follow the established procedures to their conclusion. Thus, had the court considered the Motion on September 20, there is no question but that the rights unsecured creditors, landlords and, possibly, other parties in interest would have been affected without notice and an opportunity for hearing.

Even consideration of the Motion five days after its filing and mailing (or other service) is extraordinary. The haste required in consideration of the Motion is necessitated by the limited time between Debtors' filing (September 20) and the date by which the evidence suggests a transfer of Debtors' assets must occur (October 18 at the latest).

The court is extremely concerned by this time-trap. The forced nature of its consideration of the Motion is inconsistent with the Code, due process of law, the exercise of the court's authority and simple common sense. The bankruptcy court is not a mindless business tool like a computer system or a delivery service for use at the convenience of a debtor's management.

Absent more facts than it has, though, the court cannot assign responsibility for the dilemma the parties and the court now face. However, if Debtors themselves created the present situation, their management may have forfeited entitlement to the protections

ordinarily accorded a Debtors' officers and directors who perform their duties in a chapter 11 case in good faith. If another party is responsible for the delays in commencing these cases – for it was surely clear by August 20, according to Duffy's and Crowley's testimony, that Debtors were headed for bankruptcy[9] —other sanctions might be in order.

Certainly this court is most anxious to discourage any future debtor from considering imposing in a chapter 11 case a time line similar to that called for by the Motion. In fact, chapter 11 is not intended principally as a vehicle for sales of virtually all estate property under section 363(b)(1). *See* 3 COLLIER ON BANKRUPTCY ¶ 363.02[3] (15th ed. rev. 2005). The court would infinitely prefer that a chapter 11 case be resolved through the plan process, which, pursuant to Code §§ 1109, 1125, 1126, 1128 and 1129, assures creditors and other parties in interest full disclosure, the opportunity to vote on their fates and the protections of a fully noticed confirmation process. At a minimum, if section 363(b)(1) is the means for effecting a debtor's disposition, the creditors should have the luxury of enough time for their representatives to assess fully the proposed transaction.

In the case at bar, the Unsecured Creditors' Committee organized under Code § 1102 (the "Committee") was formed during a telephone conference on September 24. Counsel was selected only that evening, little more than 12 hours prior to commencement of the hearing on the Motion. Landlords – key players in these cases – arguably fared

---

[9] Traub's testimony supports the inference that it was understood by all that the transactions pursued by Debtors in August and September would have to close by November 1 at the very latest.

better, having five days' notice (at the court's insistence) of the hearing – though those five days included a weekend.

Although the court would likely find this notice inadequate in other circumstances, in the case at bar the Committee, on the second day of the hearing, indicated it supported the Motion. Numerous landlords appeared and participated in the hearing, and the one group of landlords objecting forcefully to the Motion elicited extensive testimony from the witnesses respecting the merits of the Motion. GECC and GB supported the Motion, and the United States trustee indicated he would support whatever position the Committee took.

The court thus concludes that it cannot refuse to consider the merits of the Motion based on lack of notice or an opportunity to be heard. However, the court is not satisfied that there is no party whose rights will be affected by grant of the Motion that did not have the notice and opportunity to be heard required by the Code. Accordingly, any party claiming such lack of notice and opportunity to be heard that is able to show its interests were not adequately represented by the Committee (or another party present at the hearing) may raise the issue of due process at the hearing on sale approval on October 12.

Turning next to the merits of the Motion, the court is directed to rely heavily on the business judgment of a debtor's management in determining whether to grant relief respecting the use, sale or lease of estate property. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985); *Official Comm. of Unsecured Creditors of LTV Aerospace and Defense Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992)**.** The principal question the court thus faces is whether

management of Debtors in fact exercised good business judgment. This, in turn, depends on the process engaged in to arrive at the procedures proposed in the Motion.

Based on the testimony of Duffy, Traub and Crowley, the court finds that management of Debtors, even if dilatory and, perhaps, at times self-delusional, engaged appropriate professionals and conducted a proper inquiry to determine how best to maximize the value of Debtors' estates. The court further finds that the timing proposed by the Motion, though onerous and distressing, is appropriate to maximizing value in the unique circumstances presented in these cases.[10]

Finally, the testimony of Duffy and Traub encourages the court to conclude that it would be a disservice to creditor interests to deny the Motion. First, the bid of the Tiger JV appears to be very high, likely ensuring that the process proposed by the Motion will produce a greater return to creditors than would eventuate in chapter 7[11] (cf. Code § 1129(a)(7)). Second, the prepetition search procedures probably[12] have alerted all possible bidders to the opportunity of acquiring Debtors' assets. Third, delay will likely result (from reduced inventory as well as passage of the holiday season) in less recovery by creditors. Fourth, continued financing by GECC and GB, essential to maintaining Debtors' value, is contingent upon going forward with this expedited process.

---

[10] It would be an error for any future debtor or its counsel to assume that this court would again accept being placed under the gun as it has been in these cases.

[11] Duffy's testimony suggest that even if the Tiger JV bid prevails unsecured creditors may expect a return in this case of no less than 4% and perhaps as much as 38% of their claims. Duffy further testified he was sanguine that the Tiger JV bid would be improved upon.

[12] Duffy's testimony leaves the court unsure whether all possible bidders are sufficiently up to speed to participate in the auction process.

### III.  Conclusion

For the foregoing reasons, the Motion will be GRANTED.  The court will do so, with some variations from the procedures proposed in the Motion, by separate order.

# # # END OF OPINION # # #